**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ : | | |
| **ALEXANDER SCHUTT, et al.,** : | **CIVIL ACTION** | |
| : | | |
| **Plaintiffs,** : | | |
| **v.** : | **No. 15-2731** | |
| : | | |
| **MELMARK, INC., et al.,** : | | |
| : | | |
| **Defendants.** : | | |
| _____: | | |

**Goldberg, J.**                                                                                    **May 9, 2015**

<u>**MEMORANDUM OPINION**</u>

Alexander Schutt ("Schutt") and his parents Clarence and Barbara Schutt have brought suit against Melmark, Inc. ("Melmark"), a residential facility for individuals with intellectual disabilities, and several Melmark employees.[1] The case centers on Defendants' decision to cease providing care for Schutt and their alleged malfeasance in transporting Schutt to a crisis intervention center.

The Complaint consists of the following claims: deprivation of Fifth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 (Count 1); conspiracy to deprive civil rights pursuant to 42 U.S.C. § 1985 (Count 2); negligence (Count 3); negligence per se (Count 4); intentional infliction of emotional distress ("IIED") on behalf of Clarence and Barbara Schutt (Count 5); intentional infliction of emotional distress on behalf of Schutt (Count 6); and professional malpractice (Count 7).

---

[1] The individual defendants are Dr. Joanne Gillis-Donovan, President and CEO, Dr. George P. Linke, Jr., Vice President and Chief Operating Officer, and Dr. Jessica Woods, Executive Director of Programs. (Compl. ¶¶ 6-11.)

Defendants have moved to dismiss all claims except for the negligence claim (Count 3). For the reasons that follow, Defendants' motion to dismiss will be granted in part and denied in part.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The Complaint alleges the following facts:[2] Schutt is a twenty-nine year old autistic man from New Jersey. From 2001 until May 15, 2013, Schutt resided at Melmark's residential care facility, where he received twenty-four hour care for his "severe intellectual and physical disabilities," "maladaptive behaviors including aggression, noncompliance, elopement and PICA," and "grand mal seizures." (Compl. ¶¶ 16–17.) Schutt was initially placed at Melmark by his home school district, Princeton Regional School District, which funded Schutt's care until he "aged out of his educational entitlements" when he turned 21 years old in 2007. (Compl. ¶ 18.) Thereafter, the New Jersey Department of Developmental Disabilities ("NJ DDD") assumed "full" responsibility for funding Schutt's care at Melmark pursuant to an annual contract NJ DDD had with Melmark. (Compl. ¶ 19.)

Schutt alleges that in the spring of 2011, NJ DDD began to dispute the rates it paid for housing New Jersey residents at Melmark. During this time, NJ DDD negotiated several contract extensions to continue Schutt's care while NJ DDD searched for an alternative placement for Schutt. (Compl. ¶ 23.) Despite failing to secure a suitable alternative placement, NJ DDD ceased paying Melmark in April 2012. (Id.)

Schutt, however, continued to reside at Melmark even after his NJ DDD funding was discontinued. (Id. at ¶ 25.) Melmark subsequently filed a petition for involuntary commitment in

---

[2] When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). I assume that all facts found in the Complaint are true.

the Delaware County Court of Common Pleas requesting that the Delaware County Department of Mental Health and the Pennsylvania Department of Welfare provide residential programming for Schutt. (Id.) The petition was "unsuccessful leading [Defendants] to engage in a conspiracy to remove [Schutt] from Melmark's care." (Id. at ¶ 26.)

This "conspiracy" allegedly began in December 2012, when Woods notified Schutt's parents that, due to the lack of funding, Melmark would no longer take Schutt to any off-campus activities. (Id. at ¶ 33.) Woods allegedly "conceded" that "the decision to terminate all of [Schutt's] off-campus activities represented a concerted effort by Melmark to encourage [Schutt's parents to remove Schutt] from Melmark's care." (Id. at ¶ 37.) In November 2012, Woods refused to transport Schutt to his parents' home to celebrate Thanksgiving, despite previously agreeing to do so. (Id. at ¶¶ 38, 41.)

Nonetheless, Schutt continued to reside at Melmark into the spring of 2013. (Id. at ¶ 44.) In an email exchange between Donovan-Gillis, Linke and Woods, Woods "indicated that she wanted to do anything possible to accelerate [a] final discharge because [Schutt's] family had a lack of concern for Melmark." (Id. at ¶ 45.) Woods further stated "[t]hey raise millions of dollars for research of a debunked intervention, but have not offered one dollar to the agency taking care of their son for the past 12 years." (Id.)

Sometime thereafter, Woods indicated to another employee that Melmark would likely transfer Schutt to a crisis care facility and refuse to readmit him in the near future, and, accordingly, Woods would need to review Schutt's behavioral records. (Id. at ¶ 46.) After her review, Woods emailed the Melmark employee to change the percentage based assessments in his behavioral records, stating "the percents are so low, it's hard to make him sound 'dangerous' with that type of measurement." (Id. at ¶ 47.)

Then, on May 15, 2013, Defendants determined Schutt was behaving aggressively, despite there being no reported aggression during a routine dentist appointment Schutt attended and no staff incident and or restraint reports being generated for Schutt that day. (Id. at ¶¶ 50, 51 n.3.) Later that day, without observing Schutt, Woods determined his "behavior was escalating and he was in need of a higher level of care." (Id. at ¶ 53.)  Under the direction of Linke, who also did not observe Schutt's behaviors, Melmark employees transported Schutt to a crisis center at Kenney Hospital located in Cherry Hill, New Jersey. (Id. at ¶¶ 52, 54–55.) Despite receiving express directions from Kennedy Hospital staff to remain with Schutt until he could be seen by a physician, Melmark employees "abandoned" Schutt at the crisis center. (Id. at ¶ 57 n.6.)

Defendants failed to provide Schutt's medical records to Kennedy Hospital. As a result, the staff at Kennedy Hospital was unaware of the daily dosages of medicine Schutt required to control his seizures. (Id. at ¶ 58.) Due to Defendants' actions, Schutt "remained sedated in a windowless, padded room for eight (8) days" and "was not provided any opportunity to bathe himself." (Id. at ¶¶ 59, 60.) During this time, employees of Kennedy Hospital requested that Melmark return for Schutt but Melmark refused. (Id. at ¶ 61.)

On May 22, 2013, Schutt was declared homeless by the State of New Jersey, and after approval from NJ DDD, was transferred the following day to a temporary facility in Franklin Township, NJ where he suffered two grand mal seizures. (Id. at ¶ 65.) The seizures were the result of Schutt's removal from Melmark and Defendants' subsequent failure to provide proper documentation to the staff at Kennedy Hospital. (Id. at ¶ 65.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for failure to state a claim upon which relief can be granted. When deciding a Rule 12(b)(6)

motion, the court must accept the facts pled in the complaint as true and construe them in the light most favorable to the plaintiff. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000). A plaintiff must provide more than a formulaic recitation of a claim's elements that amounts to mere labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

## III.   DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants have moved to dismiss Counts 1, 2, 4, 5, 6 and 7 as well as the request for punitive damages in Plaintiffs' Complaint.

### i.   *Count 1 - 42 U.S.C. § 1983*

Defendants urge that Plaintiffs' section 1983 claims must be dismissed because the Complaint fails to allege facts to demonstrate that Defendants acted under the color of state law. Under section 1983, a plaintiff must demonstrate that his or her federal constitutional or statutory rights were violated by a person acting "under the color of state law." Kost v. Kozakiewitz, 1 F.3d 176, 184 (3d Cir. 1993). The essential question is whether the challenged activity "may be

fairly treated as that of the State itself[.]" Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)). Although this is a "fact-specific inquiry[,]" it may be addressed on a motion to dismiss. Schneider v. Arc of Montgomery Cty., 497 F. Supp. 2d 651, 660 (E.D. Pa. 2007) (collecting cases).

A private party may be regarded as a "a federal actor . . . under one of three interrelated theories of government action: (i) the 'public function' test, (ii) the 'close nexus' test and (iii) the 'symbiotic relationship' test." Brown v. Philip Morris Inc., 250 F.3d 789, 801 (3d Cir. 2001). In deciding whether there has been state action, the court must remain focused on the central purpose of the state action inquiry – to "assure that constitutional standards are invoked when 'it can be said that the state is responsible for the specific conduct of which plaintiff complains.'" Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (emphasis in original).

Plaintiffs contend that the Complaint contains sufficient factual allegations to demonstrate that Defendants are state actors under either the public function test or symbiotic relationship test. I first will consider the parties' arguments regarding the public function test.

The requirements of the public function test are "rigorous" and "rarely . . . satisfied." Robert S. v. Stetson School, Inc., 256 F.3d 159, 165 (3d Cir. 2001) (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995)). It requires the court to determine whether the defendant was performing a function that is "traditionally and exclusively" the province of the state. Leshko v. Servis, 423 F.3d 337, 343 (3d Cir. 2005).

In their response in opposition to the motion to dismiss, Plaintiffs urge that "Melmark and the individually named defendants perform a function that has traditionally been the exclusive domain of the government . . . the obligation to care for intellectually disabled

residents." (Pls.' Resp. p. 7.) However, the Complaint does not make this assertion nor does it contain any supporting factual allegations to suggest providing custody and care services to intellectually disabled citizens is a traditional and exclusive government function in Pennsylvania or New Jersey.[3] (See Compl. ¶¶ 69-75.) As such, the Complaint fails to adequately allege state action under the public function test.

"In civil rights cases, district courts must offer amendment – irrespective of whether it is requested – when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007). As such, I will consider whether allowing Plaintiffs an opportunity to amend the Complaint with respect to the public function test would be futile in light of the history of how New Jersey and Pennsylvania have approached the care and custody of intellectually disabled individuals.

I previously considered whether the care and custody of intellectually disabled individuals has been a traditional and exclusive government function in Pennsylvania. See Zarebicki v. Devereux Found., 2011 WL 2582140, at *5-6 (E.D. Pa. June 30, 2011). In Zarebicki, I explained:

> In Pennsylvania (and in the United States more broadly), the care of individuals with developmental disabilities was seen as a "family and local concern" until the 1840s. Schneider v. Arc of Montgomery County, et al., 497 F. Supp. 2d 651, 655–56 (E.D. Pa. 2007) (citing James W. Trent, Inventing the Feeble Mind: A History of Mental Retardation in the United States 2, 15 (1994)). In Pennsylvania, private citizens have and continue to provide care for developmentally disabled members

---

[3] Plaintiffs appear to assume that New Jersey, as the state that funded Schutt's care, rather than Pennsylvania, the state in which Melmark is located, forms the proper realm of inquiry. As the Complaint is completely devoid of any allegations regarding whether providing residential care to intellectually disabled individuals has traditionally been the exclusive domain of either New Jersey or Pennsylvania, I need not resolve the question of which State should form the basis of the inquiry at this stage. If Plaintiffs file an amended complaint, they should clarify whether they contend New Jersey, Pennsylvania or both form the proper realm(s) of inquiry.

of their families. I, therefore, am unable to foresee how Plaintiff could plausibly demonstrate that providing custody, care and habilitative services to the mentally disabled is a traditional and exclusive prerogative of Pennsylvania. Cf. Sybalski v. Independent Group Home Living Program, Inc., 2007 WL 1202864 at —— 4–5 (E.D.N.Y. Apr. 24, 2007) (concluding that a private group home for mentally disabled, certified and licensed under New York law, was not a state actor because "care for the mentally disabled was neither traditionally nor exclusively reserved to the state"); Karaahmetoglu v. Res–Care, Inc., 480 F. Supp. 2d 183, 188 (D.C. 2007) (granting of motion to dismiss, holding that "plaintiff has not even established that the provision of residential and rehabilitative services for voluntary commitments should be considered a traditional state function").

This conclusion is bolstered by the Third Circuit's decision in Leshko v. Servis, 423 F.3d 337 (3d Cir. 2005), which undertook an in-depth analysis of whether a function is traditionally and exclusively reserved to the state. In Leshko, plaintiff sustained serious burns when her foster mother allegedly left her alone next to a pot of hot water, which she overturned onto herself. Plaintiff alleged that her foster parents violated her Fourteenth Amendment right to be free from physical harm, and that they were state actors because they were county "employees" and Pennsylvania had placed her in their custody pursuant to its statutory foster care system. Id. at 337–39.

The Third Circuit affirmed the district court's dismissal of plaintiff's complaint, holding that the defendants were not state actors because the state had not delegated a "traditional and exclusive" state function. The Court concluded that no aspect of the foster care system had been the exclusive province of Pennsylvania and distinguished the state's care for foster children from its provision of medical services to prisoners, which constituted state action under West v. Atkins, 487 U.S. 42, 54-55, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). Id. at 343–47.

In distinguishing West, the Court determined that, while "[c]onstitutional obligations on a state are powerful evidence that the required functions are traditionally governmental," neither the "federal Constitution nor the Pennsylvania Constitution requires that the state provide care for foster children." Id. at 344. Foster care in Pennsylvania, rather, "is a creature of statute, begun in 1981 under Pennsylvania's Juvenile Act." Id. The Leshko Court also determined that, unlike the prisoner in West, plaintiff's care was not delivered in an institutional setting. Further, although only Pennsylvania could select plaintiff's caregiver, as in the case in prison, "[i]t simply cannot be said that, historically, foster children in Pennsylvania could only turn to caregivers authorized by the Commonwealth." Id. at 345–47.

Similarly, Pennsylvania's provision of care, custody and habilitative services to the mentally disabled is also a "creature of statute," which is not mandated by the federal Constitution or the Pennsylvania Constitution. Although Plaintiff was not

cared for in a private residence, as the plaintiff in <u>Leshko</u>, he received treatment in a private "group home." <u>See</u> (Compl.¶¶ 10–28.) Plaintiff has not offered any allegations to suggest that his experience in this setting was comparable to the "tight security-based strictures of prison life," such that "persuasive institutional influences" render his situation analogous to that of a prisoner or an involuntary civil commitment who is constrained by authority that is "quintessentially governmental." <u>Leshko</u>, 423 F.3d at 346. Further, as in <u>Leshko</u>, mentally disabled citizens have not, historically, been required to turn to Pennsylvania or state-authorized entities for care, custody and habilitative services. <u>See</u> <u>id.</u> at 345–47.

<u>Zarebicki</u>, 2011 WL 2582140, at *5-6.

The foregoing analysis appears to apply with equal force to the question of whether the care and custody of individuals with intellectual disabilities has been a traditional and exclusive government function in New Jersey. <u>See, e.g.</u>, Deborah Spitalnik, <u>Developmental Disabilities in New Jersey: Where New Jersey Stands in Services to People with Developmental Disabilities and National Policy Trends</u>, The Elizabeth M. Boggs Center on Developmental Disabilities (2010) (70% of the "caseload of the [New Jersey] Division of Developmental Disabilities, live at home with their families"); <u>New Jersey Ass'n for Retarded Citizens, Inc. v. New Jersey Dept. of Human Services</u>, 445 A.2d 704, 711-12 (N.J. 1982) (holding that New Jersey <u>statutes</u> grant intellectually disabled individuals "the legal right to treatment, education, training, habilitation, care and protection.") Although, the foregoing casts significant doubt on Plaintiffs' ability to proceed under the public function theory, I am not prepared to conclude that any proposed amendment in this regard would be futile.

Alternatively, Plaintiffs contend that they have sufficiently alleged that Defendants are state actors under the symbiotic relationship test. In <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715 (1961), the Supreme Court held "that a coffee shop, which leased property located in a government owned parking garage, was integrated with the parking facility as an organic part of the government operation and was party to a mutually beneficial relationship with the

government." <u>Brown</u>, 250 F.3d at 803. "Out of these facts arose the 'symbiotic relationship test,'

which asks whether the government has 'insinuated itself into a position of interdependence'

with the defendant." <u>Id.</u> "While the exact contours of this state action inquiry are difficult to

delineate, the interdependence between the state and private actor must be pronounced before the

law will transform the private actor into a state actor." <u>Groman v. Township of Manalapan</u>, 47

F.3d 628, 641 (3d Cir. 1995).

      In support of their "symbiotic relationship" theory, Plaintiffs note that the Complaint

alleges that:

> The federal funding structure (which includes Medicare, Medicaid and ICF/IID
> [Intermediate Care Facilities for Individuals with Intellectual Disabilities]
> funding) between various states including but not limited to Pennsylvania, New
> Jersey and New York and Melmark creates a symbiotic relationship between the
> two as the states derive substantial benefit by providing federal funding to
> Melmark on behalf of their citizens who are Melmark residents.

(Compl. ¶ 73.) Plaintiffs cite to <u>Children's Hospital of Philadelphia v. Horizon NJ Health</u>, 2008

WL 4330311 (E.D. Pa. Sept. 22, 2008) wherein the court held that allegations that the defendant

received approximately fifty percent of its funding from federal sources and that the state derived

a substantial benefit from such funding sufficient to allege a symbiotic relationship. <u>Id.</u> at *1.

Plaintiffs urge that under <u>Horizon NJ Health</u>, the Complaint contains sufficient allegations to

proceed under the symbiotic relationship test.

      Contrary to Plaintiffs' assertion and the holding in <u>Childrens Hosp. v. Horizon NJ Health</u>,

a private entity's receipt of state funding does not transform it into a state actor. <u>See</u> <u>Blum v.</u>

<u>Yaretsky</u>, 457 U.S. 991, 1011 (1982) (rejecting argument that nursing homes were state actors in

light of "state subsidization of the operating and capital costs of the facilities, payment of the

medical expenses of more than 90% of the patients in the facilities, and the licensing of the

facilities by the State"); <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 840 (1982) (school not a state

actor even though "virtually all of the school's income was derived from government funding");
Klavan v. Crozer-Chester Med. Ctr., 60 F. Supp. 2d 436, 443 (E.D. Pa. 1999) ("defendants'
receipt of government funding, even if combined with [extensive regulation], does not render
defendants state actors, regardless of which test we employ"); Edwards v. Lutheran Sr. Services
of Dover, Inc., 603 F. Supp. 315, 321 (D. Del. 1985) ("extensive state regulation and funding
are, by themselves, insufficient to establish a symbiotic relationship.") Therefore, I conclude that
Plaintiffs have failed to allege facts sufficient to support their argument that Defendants are state
actors under the symbiotic relationship test.

Plaintiffs will be given an opportunity to amend their Complaint to attempt to cure, if
possible, the foregoing deficiencies.

### ii. Count 2 – 42 U.S.C. § 1985(3)

Defendants have also moved to dismiss Plaintiffs' section 1985 claim on the grounds that
the Complaint fails to allege that the purported conspiracy to deprive Schutt of his constitutional
rights was motivated by class based discriminatory animus.

"[I]n order to state a claim under section 1985(3), a plaintiff must allege: (1) a
conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive,
directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act
in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any
right or privilege of a citizen of the United States." Lake v. Arnold, 112 F.3d 682, 685 (3d Cir.
1997) (citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)). Regarding the second
element, a plaintiff must allege that "the conspiracy was motivated by discriminatory animus
against an identifiable class." Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006).
Commercial and economic animus cannot form the basis of a section 1985 claim. Lake, 112 F.3d

at 685 (citing United Brotherhood of Carpenters and Joiners of America v. Scott, 463 U.S. 825 (1983)).

Defendants note that the Complaint fails to make any allegation that Defendants' conduct was motivated by class based animus. In their response, Plaintiffs fail to identify any allegations in the Complaint to the contrary. Rather, Plaintiffs' response is devoted to arguing that Schutt, as an individual with intellectual disabilities, is a member of a protected class. However, Defendants have not moved to dismiss the section 1985 claim on the grounds that Schutt is not a member of a protected class. Instead, Defendants correctly note that the Complaint alleges that Defendants' actions were economically motivated as the decision to transport Schutt to Kennedy Hospital was made in response to the fact that Melmark had not received any funding for Schutt's care for over a year. (See, e.g., Compl. ¶¶ 27, 31, 33 and 37.) These allegations do not plausibly suggest that Defendants' alleged conspiracy was motivated by animus towards Schutt's status as an individual with intellectual disabilities. As such, the Complaint fails to state a claim under section 1985 and Defendants' motion to dismiss Count 2 will be granted without prejudice.

        *iii.*    *Count 4 – Negligence Per Se*

Defendants have moved to dismiss the negligence per se claim Plaintiffs have brought against all Defendants. Under the doctrine of negligence per se, a violation of a statute or regulation may be grounds for finding that a defendant is per se liable. Mest v. Cabot Corp., 449 F.3d 502, 518 (3d Cir. 2006). To assert a claim for negligence per se, the plaintiff must demonstrate that: "1) the statute or regulation clearly applies to the conduct of the defendant; 2) the defendant violated the statute or regulation; 3) the violation of the statute proximately caused the plaintiff's injuries; and 4) the statute's purpose is, at least in part, to protect the interest of the

plaintiff individually, as opposed to the public." Id. (citing Wagner v. Anzon, Inc., 684 A.2d 570, 574 (Pa. Super. 1996)).

In support of the negligence per se claim, Plaintiffs allege that Defendants violated multiple provisions of the Omnibus Budget Reconciliation Act ("OBRA"), including the following:

a. 42 CFR §483.12(a)(3), when a facility transfers or discharges a resident under any of the circumstances specified in paragraphs (a)(2)(i) through (5) of this section, the resident's clinical record must be documented.

b. 42 CFR §483.12(a)(4), before a facility transfers or discharges a resident, the facility must (i) notify the resident and, if known, a family member or legal representative of the resident of the transfer or discharge and the reasons for the move must be in writing and in a language and manner they understand; (ii) record the reasons in the resident's clinical record; and (iii) include in the notice the items described in paragraph (a)(6) of this section.

c. 42 CFR §483.12(a)(5), except as specified in paragraphs (a)(5)(ii) and (a)(8) of this section, the notice of transfer or discharge required in paragraph (a)(4) of this section must be made by the facility at least 30 days before the resident is transferred or discharged.

d. 42 CFR §483.12(a)(6), the written notice specified in paragraph (a)(4) of this section must include the following: (i) reason for discharge; (ii) effective date of transfer or discharge; (iii) location to which the resident is transferred or discharged; (iv) a statement that the resident has a right to appeal the action to the state; (v) the name, address and telephone number of the State long term care ombudsman; (vi) for nursing facility residents with developmental disabilities, the mailing address and telephone number of the agency responsible for the protection and advocacy of the developmentally disabled individuals established under Part C of the Development Disabilities Assistance and Bill of Rights Act; and (vii) for nursing facility residents who are mentally ill, the mailing address and telephone number of the agency responsible for the protection and advocacy of mentally ill individuals established under the Protection and Advocacy for Mentally Ill Individuals Act.

(Compl. ¶ 88.)

In their motion, Defendants argue that the Complaint does not include "any facts to support the allegations that Defendants violated [these] provisions of the statute or that OBRA would even apply to Melmark." (Defs.' Mot. p. 20.)

I agree with Defendants that the Complaint does not contain any allegations that Melmark, as an institution, is subject to the aforementioned provisions of OBRA. Additionally, even if the Complaint did so allege, those allegations may be inconsistent with the scope of OBRA's coverage. The provisions of OBRA on which Plaintiffs rely apply to "facilities," a term which:

> means a skilled nursing facility (SNF) that meets the requirements of sections 1819(a), (b), (c), and (d) of the Act, or a nursing facility (NF) that meets the requirements of sections 1919(a), (b), (c), and (d) of the Act. "Facility" may include a distinct part of an institution (as defined in paragraph (b) of this section and specified in § 440.40 and § 440.155 of this chapter), but <u>does not include an institution for individuals with intellectual disabilities</u> or persons with related conditions described in § 440.150 of this chapter.

42 C.F.R. § 483.5 (emphasis added).

Plaintiffs describe Melmark as "comprehensive multi-service long-term care provider of residential, educational, vocational and therapeutic services for <u>children and adults with intellectual disabilities</u>." (Compl. ¶ 4 (emphasis added.)) As such, there appears to be an issue as to whether the referenced provisions of OBRA apply to Melmark. Defendants' motion to dismiss Count 4 will be granted without prejudice and Plaintiffs will be given leave to attempt, if possible, to cure these deficiencies.

   iv. <u>*Counts 5 and 6 – Intentional infliction of Emotional Distress*</u>

Defendants have also moved to dismiss the intentional infliction of emotional distress ("IIED") claims brought by Schutt (Count 5) as well as his parents (Count 6).

The tort of intentional infliction of emotional distress "requires, inter alia*,* intentional extreme and outrageous conduct on the part of the tortfeasor, which causes severe emotional

distress to the plaintiff." Weiley v. Albert Einstein Med. Ctr., 51 A.3d 202, 216 (Pa. Super. 2012).[4] "However, 'where such conduct is directed at a third person' the person claiming the emotional distress must also establish that he is a member of the victim's immediate family and that he or she was 'present at the time' of the tortious conduct." Id. (citing Restatement (Second) Torts § 46(2)).

Defendants argue that the actions the Complaint alleges do not rise to the level of "extreme and outrageous" conduct. Rather, Defendants urge that they continued to care for Schutt for approximately thirteen months without receiving any funding and that when Schutt's "behaviors became too aggressive, he was transported to a well-known medical center." (Defs.' Mot. p. 23.)

Accepting Plaintiffs' factual allegations as true, I conclude that the Complaint sets forth conduct that could reasonably be described as extreme and outrageous. Plaintiffs allege that Defendants left Schutt, a non-verbal individual with serious intellectual disabilities, at a facility without providing the staff there with adequate information about his condition or medications. Plaintiffs further allege that, as a result of Defendants' conduct, Schutt was confined, sedated, not permitted to bathe for eight days and, eventually had several seizures. Arguments disputing Plaintiffs' characterizations of Defendants' intentions or what occurred at Kennedy Hospital are not appropriate at this juncture and do not nullify the Complaint's factual allegations. Defendants' motion to dismiss the Complaint's IIED claims for failure to allege extreme and outrageous conduct will be denied.

---

[4] The Pennsylvania Supreme Court has "noted that it has not had the occasion to adopt the tort of IIED expressly, but the Court has acknowledged its existence and has analyzed its elements in various respects." Weiley v. Albert Einstein Med. Ctr., 51 A.3d 202, 216 (Pa. Super. 2012) (citing to Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998); Kazatsky v. King David Mem'l Park, Inc., 527 A.2d 988, 988-89 (Pa. 1987)).

Defendants have also moved to dismiss the IIED claim brought on behalf of Schutt's parents on an additional ground. Defendants urge that the IIED claim fails to allege that Schutt's parents were "present" when the alleged tortious conduct occurred.

The Pennsylvania Supreme Court narrowly construed the presence requirement in <u>Taylor v. Albert Einstein Medical Center</u>, 754 A.2d 650 (Pa. 2000). That case concerned the death of a 16–year–old child during a medical procedure. The Pennsylvania Supreme Court held that the child's mother could not recover for IIED because she was in the other room and, therefore, not present when the procedure was performed. <u>Id.</u> at 652.

I conclude that Schutt's parents have not pled a claim for IIED because the Complaint does not allege that they were present when any of the supposedly tortious conduct occurred. Specifically, the Complaint does not allege that they were present when Schutt was removed from Melmark or any point during his eight day stay at Kennedy Hospital.[5] Given that the presence requirement is narrowly construed and the complete absence of any allegations to suggest that they personally observed any of the allegedly tortious conduct, the Complaint fails to state a claim for IIED on behalf of Schutt's parents.

     *v.*    *<u>Count 7 – Professional Malpractice</u>*

Plaintiffs have brought a professional malpractice claim against Woods and Melmark. Defendants have moved to dismiss this claim on the grounds that Plaintiffs have failed to file a Certificate of Merit as is required by Pennsylvania Rule of Civil Procedure 1042.[6] In their

---

[5] I note that, in their response to the motion to dismiss, Plaintiffs assert that Schutt's parents were present at Kennedy Hospital. Even assuming this allegation is sufficient to satisfy the "presence requirement," it does not appear in the Complaint.

[6] Pennsylvania Rule of Civil Procedure 1042 requires that a plaintiff submit a Certificate of Merit within sixty days of the filing of a Complaint which includes a professional liability claim. "Pennsylvania Rule 1042.3, mandating a certificate of merit in professional negligence claims, is

response, Plaintiffs acknowledge that they did not file a Certificate of Merit and stipulate to the dismissal of Count 7 without prejudice.

      *vi.*    <u>*Damages*</u>

Lastly, Defendants have moved to dismiss Plaintiffs' request for punitive damages on the basis that the Complaint does not allege any conduct that could be considered willful, wanton or in reckless disregard for a person's welfare. For the reasons discussed above in the context of Defendants' motion to dismiss Count 5, the Complaint alleges conduct that could plausibly evidence a reckless disregard for Schutt's welfare. If accepted as true, the allegation that Melmark "abandon[ed Schutt], a non-verbal, intellectually disabled and autistic individual, in a New Jersey crisis center without medical administration records and without waiting for [him] to be evaluated" might support a claim for punitive damages. (Pls.' Resp. p. 14.)

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss will be granted in part and denied in part. An appropriate Order follows.

---

substantive law under the <u>Erie</u> Rule and must be applied as such by federal courts." <u>Liggon-Redding v. Est. of Sugarman</u>, 659 F.3d 258, 265 (3d Cir. 2011).