IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDER SCHUTT, et al., | CIVIL ACTION |
| Plaintiffs, | |
| v. | No. 15-2731 |
| MELMARK, INC., et al., | |
| Defendants. | |

Goldberg, J.                                                             April 24, 2017

**MEMORANDUM OPINION**

Alexander Schutt ("Schutt"), a disabled adult, and his parents Clarence and Barbara Schutt have brought suit against Melmark, Inc. ("Melmark"), a residential facility for individuals with intellectual disabilities, and several Melmark employees.[1] Plaintiffs' claims arise from Defendants' decision to cease providing residential care for Schutt and their alleged malfeasance in transporting Schutt to a crisis intervention center.

The Amended Complaint consists of the following claims: a deprivation of Fifth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 on behalf of Schutt (Count 1); a conspiracy to deprive civil rights pursuant to 42 U.S.C. § 1985 on behalf of Schutt (Count 2); negligence on behalf of Schutt (Count 3); intentional infliction of emotional distress ("IIED") on

---

[1] The individual defendants are Dr. Joanne Gillis-Donovan, President and CEO, Dr. George P. Linke, Jr., Vice President and Chief Operating Officer, and Dr. Jessica Woods, Executive Director of Programs. (Am. Compl. ¶¶ 9-15.)

1

behalf of Schutt (Count 4); and intentional infliction of emotional distress on behalf of Clarence and Barbara Schutt (Count 5).[2] All claims are brought against all Defendants.

On May 9, 2016, I granted in part and denied in part Defendants' motion to dismiss Plaintiffs' initial Complaint. Plaintiffs were given leave to file an amended complaint to cure, if possible, the deficiencies outlined in the May 9, 2016 opinion. Thereafter, Plaintiff filed an Amended Complaint.

Presently before me is Defendants' motion to dismiss in which they argue that the Amended Complaint fails to cure any of the deficiencies which led to the dismissal of many of the claims contained in the initial Complaint. For the reasons that follow, Defendants' motion to dismiss will be granted.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

The substantive allegations contained in the initial Complaint and the Amended Complaint are largely identical. As such, I rely on the recitation of those allegations contained in my May 9, 2016 Opinion:

- Schutt is a twenty-nine year old autistic man from New Jersey. From 2001 until May 15, 2013, Schutt resided at Melmark's residential care facility, where he received twenty-four hour care for his "severe intellectual and physical disabilities," "maladaptive behaviors including aggression, noncompliance, elopement and PICA," and "grand mal seizures." (Compl. ¶¶ 16–17.) Schutt was initially placed at Melmark by his home school district, Princeton Regional School District, which funded Schutt's care until he "aged out of his educational entitlements" when he turned 21 years old in 2007. (Compl. ¶ 18.) Thereafter, the New Jersey Department of Developmental Disabilities ("NJ DDD") assumed "full" responsibility for funding Schutt's care at Melmark pursuant to an annual contract NJ DDD had with Melmark. (Compl. ¶ 19.)

---

[2] The initial Complaint included claims for negligence per se and professional malpractice. Those claims do not appear in the Amended Complaint.

- Schutt alleges that in the spring of 2011, NJ DDD began to dispute the rates it paid for housing New Jersey residents at Melmark. During this time, NJ DDD negotiated several contract extensions to continue Schutt's care while NJ DDD searched for an alternative placement for Schutt. (Compl. ¶ 23.) Despite failing to secure a suitable alternative placement, NJ DDD ceased paying Melmark in April 2012. (Id.)

- Schutt, however, continued to reside at Melmark even after his NJ DDD funding was discontinued. (Id. at ¶ 25.) Melmark subsequently filed a petition for involuntary commitment in the Delaware County Court of Common Pleas requesting that the Delaware County Department of Mental Health and the Pennsylvania Department of Welfare provide residential programming for Schutt. (Id.) The petition was "unsuccessful leading [Defendants] to engage in a conspiracy to remove [Schutt] from Melmark's care." (Id. at ¶ 26.)

- This "conspiracy" allegedly began in December 2012, when Woods notified Schutt's parents that, due to the lack of funding, Melmark would no longer take Schutt to any off-campus activities. (Id. at ¶ 33.) Woods allegedly "conceded" that "the decision to terminate all of [Schutt's] off-campus activities represented a concerted effort by Melmark to encourage [Schutt's parents to remove Schutt] from Melmark's care." (Id. at ¶ 37.) In November 2012, Woods refused to transport Schutt to his parents' home to celebrate Thanksgiving, despite previously agreeing to do so. (Id. at ¶¶ 38, 41.)

- Nonetheless, Schutt continued to reside at Melmark into the spring of 2013. (Id. at ¶ 44.) In an email exchange between Donovan-Gillis, Linke and Woods, Woods "indicated that she wanted to do anything possible to accelerate [a] final discharge because [Schutt's] family had a lack of concern for Melmark." (Id. at ¶ 45.) Woods further stated "[t]hey raise millions of dollars for research of a debunked intervention, but have not offered one dollar to the agency taking care of their son for the past 12 years." (Id.)

- Sometime thereafter, Woods indicated to another employee that Melmark would likely transfer Schutt to a crisis care facility and refuse to readmit him in the near future, and, accordingly, Woods would need to review Schutt's behavioral records. (Id. at ¶ 46.) After her review, Woods emailed the Melmark employee to change the percentage based assessments in his behavioral records, stating "the percents are so low, it's hard to make him sound 'dangerous' with that type of measurement." (Id. at ¶ 47.)

- Then, on May 15, 2013, Defendants determined Schutt was behaving aggressively, despite there being no reported aggression during a routine dentist appointment Schutt attended and no staff incident and or restraint reports being generated for Schutt that day. (Id. at ¶¶ 50, 51 n.3.) Later that

- day, without observing Schutt, Woods determined his "behavior was escalating and he was in need of a higher level of care." (Id. at ¶ 53.)

- Under the direction of Linke, who also did not observe Schutt's behaviors, Melmark employees transported Schutt to a crisis center at Kenney Hospital located in Cherry Hill, New Jersey. (Id. at ¶¶ 52, 54–55.) Despite receiving express directions from Kennedy Hospital staff to remain with Schutt until he could be seen by a physician, Melmark employees "abandoned" Schutt at the crisis center. (Id. at ¶ 57 n.6.)

- Defendants failed to provide Schutt's medical records to Kennedy Hospital. As a result, the staff at Kennedy Hospital was unaware of the daily dosages of medicine Schutt required to control his seizures. (Id. at ¶ 58.) Due to Defendants' actions, Schutt "remained sedated in a windowless, padded room for eight (8) days" and "was not provided any opportunity to bathe himself." (Id. at ¶¶ 59, 60.) During this time, employees of Kennedy Hospital requested that Melmark return for Schutt but Melmark refused. (Id. at ¶ 61.)

- On May 22, 2013, Schutt was declared homeless by the State of New Jersey, and after approval from NJ DDD, was transferred the following day to a temporary facility in Franklin Township, NJ where he suffered two grand mal seizures. (Id. at ¶ 65.) The seizures were the result of Schutt's removal from Melmark and Defendants' subsequent failure to provide proper documentation to the staff at Kennedy Hospital. (Id. at ¶ 65.)

(Op. pp. 2-4, 5/9/16.)

The Amended Complaint is largely identical to the initial Complaint except for the inclusion of following new allegations:

The Amended Complaint references the Individuals with Disabilities Education Improvement Act ("IDEA"), and several New Jersey statutes which, respectively, govern New Jersey's obligation to provide intellectually disabled children with a free and appropriate public education until age 21, see 20 U.S.C. §§ 1401–82, and intellectually disabled adults with appropriate services, see N.J. Stat. Ann. § 30:4-25.6, 25.7. (See Am. Compl. ¶¶ 7, 21, 22, 24-26, 29, 34.) The Amended Complaint also alleges that New Jersey delegated to Melmark the foregoing statutory duties to provide Alex with services because New Jersey was unable to provide the services itself. (Id. at ¶¶ 22, 25-27.)

The Amended Complaint also alleges that Schutt forfeited his social security disability benefits to New Jersey as his "required contribution to care for the residential and adult program services funded by" the NJ DDD. (Id. at. ¶ 35.)

Additionally, the Amended Complaint includes new allegations that Defendants engaged in similar conspiracies to deprive not just Schutt but "other disabled New Jersey residents residing at Melmark of their federally protected rights." (Id. at ¶ 103.) The Amended Complaint further elaborates that Defendants "targeted to remove these disabled New Jersey residents, including Alex, via instituting involuntary commitment proceedings in an effort to provide for clients from Pennsylvania counties and eliminate ongoing disputes with NJ DDD." (Id. at ¶¶ 105, 40-41 ("Melmark targeted to remove these disabled New Jersey residents, including Alex, in an effort to provide for clients form Pennsylvania counties and to not have to deal with the fluctuating funding structures and requirements of NJ DDD")).

Lastly, the Amended Complaint now alleges that Schutt's parents "witnessed their son abandoned by Melmark for the duration of his 8 days" at Kennedy Hospital. (Id. at ¶ 80.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for failure to state a claim upon which relief can be granted. When deciding a Rule 12(b)(6) motion, the court must accept the facts pled in the complaint as true and construe them in the light most favorable to the plaintiff. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000). A plaintiff must provide more than a formulaic recitation of a claim's elements that amounts to mere labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

5

true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

## III. DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants have moved to dismiss Counts 1, 2, 4 and 5 of the Amended Complaint as well as Plaintiff's request for punitive damages.

### A. *Count 1 - 42 U.S.C. § 1983*

Plaintiffs' section 1983 claim was previously dismissed because the initial Complaint failed to allege sufficient facts to demonstrate that Defendants acted under the color of state law. According to Defendants, the Amended Complaint fails to cure this deficiency.

Under section 1983, a plaintiff must demonstrate that his or her federal constitutional or statutory rights were violated by a person acting "under the color of state law." Kost v. Kozakiewitz, 1 F.3d 176, 184 (3d Cir. 1993). The essential question is whether the challenged activity "may be fairly treated as that of the State itself[.]" Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)). Although this is a "fact-specific inquiry[,]" it may be addressed on a

motion to dismiss. Schneider v. Arc of Montgomery Cty., 497 F. Supp. 2d 651, 660 (E.D. Pa. 2007) (collecting cases).

A private party may be regarded as "a federal actor . . . under one of three interrelated theories of government action: (i) the 'public function' test, (ii) the 'close nexus' test and (iii) the 'symbiotic relationship' test." Brown v. Philip Morris Inc., 250 F.3d 789, 801 (3d Cir. 2001). In deciding whether there has been state action, the court must remain focused on the central purpose of the state action inquiry – to "assure that constitutional standards are invoked when 'it can be said that the state is responsible for the specific conduct of which plaintiff complains.'" Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (emphasis in original).

Plaintiffs urge that the Amended Complaint contains sufficient factual allegations to demonstrate that Defendants are state actors under both the public function test and the symbiotic relationship test. I first will consider the public function test.

      a. Public Function Test

The requirements of the public function test are "rigorous" and "rarely . . . satisfied." Robert S. v. Stetson School, Inc., 256 F.3d 159, 165 (3d Cir. 2001) (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995)). It requires the court to determine whether the defendant was performing a function that is "traditionally and exclusively" the province of the state. Leshko v. Servis, 423 F.3d 337, 343 (3d Cir. 2005).

I previously concluded that the initial Complaint failed to assert or present any supporting factual allegations to suggest providing custody and care services to intellectually disabled citizens is a traditional and exclusive government function in Pennsylvania or New Jersey. (Op. pp. 6-9, 5/9/16.) Plaintiffs renew their public function argument and urge that the education

7

services Melmark provides to intellectually disabled children and the residential services it provides to intellectually disabled adults are sufficient to render Defendants state actors under the public function test. In support, Plaintiffs cite to the IDEA and related New Jersey state statutes to argue that New Jersey delegated these statutorily mandated functions to Melmark.

Nothing in the Amended Complaint nor Plaintiffs' response to Defendants' motion to dismiss changes the analysis of Plaintiffs' "public function" argument laid out in my May 9, 2016 opinion. The fact that New Jersey has certain statutory obligations to provide services to intellectually disabled citizens does not transform the provision of those services into a traditional and <u>exclusive</u> government function. As previously explained, the fact that the relevant function is a "creature of statute" rather than a constitutional mandate weighs against a finding that the function is traditionally and exclusively reserved to the state. See <u>Leshko v. Servis</u>, 423 F.3d 337, 344-347 (3d Cir. 2005). Plaintiffs' reliance on the IDEA and New Jersey statutes is unavailing and I conclude that the Amended Complaint fails to adequately allege state action under the public function theory.

      b. Symbiotic Relationship Test

Defendants also urge that the Amended Complaint, like the initial Complaint, fails to allege that they were state actors under the symbiotic relationship.

In <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715 (1961), the Supreme Court held "that a coffee shop, which leased property located in a government owned parking garage, was integrated with the parking facility as an organic part of the government operation and was party to a mutually beneficial relationship with the government." <u>Brown</u>, 250 F.3d at 803. "Out of these facts arose the 'symbiotic relationship test,' which asks whether the government has 'insinuated itself into a position of interdependence' with the defendant." <u>Id.</u> "While the exact

contours of this state action inquiry are difficult to delineate, the interdependence between the state and private actor must be pronounced before the law will transform the private actor into a state actor." Groman v. Township of Manalapan, 47 F.3d 628, 641 (3d Cir. 1995).

In opposing Defendants' motion to dismiss the Amended Complaint, Plaintiffs again rely on Children's Hospital of Philadelphia v. Horizon New Jersey Health, 2008 WL 4330311 (E.D. Pa. Sept. 22, 2008). In that case, the district court found allegations that the defendant received approximately fifty percent of its funding from federal sources and that the state derived a substantial benefit from such funding sufficient to allege a symbiotic relationship. Id. at *1. As I explained, contrary to Plaintiffs' assertion and the holding in Children's Hospital, a private entity's receipt of state funding does not transform it into a state actor. Nothing in Plaintiffs' submission demonstrates that my prior rejection of Plaintiffs' reliance on Children's Hospital was incorrect.

> Plaintiffs nonetheless urge that:
>
> The facts of the instant case illustrate a close association of mutual benefit between the state of New Jersey and Melmark that consists of more than just funding. New Jersey's intimate involvement with Alex's institutionalization includes but is not limited to actually placing him at Melmark, providing funding for the same, accepting the required New Jersey contributions to care from Alex's social security check which were sent to the state at all relevant times, providing case workers to manage Alex's benefits/programs and participating in the creation of Alex's individual support plans (ISPs).

(Pls.' Resp. p. 11.)

Plaintiffs further state that they received correspondence from Melmark indicating that "representatives from the state of New Jersey" had been invited to participate in a meeting regarding Schutt's care that was scheduled to take place on the date Schutt was transported to Kennedy Hospital. (Id.) The allegations regarding state social workers, case managers and/or representatives from New Jersey participating in Schutt's care do not appear in the Amended

9

Complaint and, therefore, are not properly before me. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (in deciding "a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.") That said, even if these allegations had been included, they would not change the analysis of Plaintiffs' claims because this participation does not create a "pronounced interdependence" between New Jersey and Melmark. Groman, 47 F.3d at 641.

Although the remaining facts identified by Plaintiff concerning the financial relationship between Melmark and New Jersey are included in the Amended Complaint, they are not sufficient to make out state action. As noted above, extensive state funding is inadequate to establish a symbiotic relationship. See Blum v. Yaretsky, 457 U.S. 991, 1011 (1982) (rejecting argument that nursing homes were state actors in light of "state subsidization of the operating and capital costs of the facilities, payment of the medical expenses of more than 90% of the patients in the facilities, and the licensing of the facilities by the State"); Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982) (school not a state actor even though "virtually all of the school's income was derived from government funding"); Klavan v. Crozer-Chester Med. Ctr., 60 F. Supp. 2d 436, 443 (E.D. Pa. 1999) ("defendants' receipt of government funding, even if combined with [extensive regulation], does not render defendants state actors, regardless of which test we employ"); Edwards v. Lutheran Sr. Services of Dover, Inc., 603 F. Supp. 315, 321 (D. Del. 1985) ("extensive state regulation and funding are, by themselves, insufficient to establish a symbiotic relationship.") As such, Plaintiffs' section 1983 claim will be dismissed.

### B. *Count 2 – 42 U.S.C. § 1985(3)*

Defendants have again moved to dismiss Plaintiffs' section 1985 claim on the grounds that the Amended Complaint, like the initial Complaint, fails to allege that the purported

conspiracy to deprive Schutt of his constitutional rights was motivated by class based discriminatory animus.

"[I]n order to state a claim under section 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997) (citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)). Regarding the second element, a plaintiff must allege that "the conspiracy was motivated by discriminatory animus against an identifiable class." Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006). Commercial and economic animus cannot form the basis of a section 1985 claim. Lake, 112 F.3d at 685 (citing United Brotherhood of Carpenters and Joiners of America v. Scott, 463 U.S. 825 (1983)).

I previously granted Defendants' motion to dismiss Plaintiffs' section 1985 claim because the initial Complaint alleged that "Defendants' actions were economically motivated as the decision to transport Schutt to Kennedy Hospital was made in response to the fact that Melmark had not received any funding for Schutt's care for over a year. . . . These allegations do not plausibly suggest that Defendants' alleged conspiracy was motivated by animus towards Schutt's status as an individual with intellectual disabilities." (Op. pp. 11-12, 5/9/16.)

In support of their argument that the Amended Complaint cured this deficiency, Plaintiffs point to the newly added and somewhat vague allegations that Defendants engaged in similar conduct with respect to other adults from New Jersey in their care. However, the Amended Complaint still alleges that Defendants conspired to force Schutt and other New Jersey residents

11

out of Melmark because New Jersey ceased paying Melmark for their care. These are conclusory allegations and nothing in the Amended Complaint plausibly alleges that Defendants' actions were motivated by animus towards Schutt or other New Jersey residents as individuals with disabilities.

In sum, taking into account the newly added allegations and viewing the Amended Complaint in the light most favorable to Plaintiffs, I concluded that Plaintiffs have not plausibly alleged a nexus between Schutt's status as an individual with a disability and the alleged conspiracy.

    C. *Leave to Amend*

Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." District courts have discretion to deny a plaintiff's request to amend their complaint, however, "if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). An amendment of a complaint is futile if "the amendment would not cure the deficiency in the original complaint or if the amended complaint cannot withstand a motion to dismiss." Massarsky v. General Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983).

Plaintiffs were previously granted leave to amend their complaint and failed to cure the deficiencies explicitly identified in the May 9, 2016 opinion. Nothing in Plaintiffs' complaints or their opposition to Defendants' motion to dismiss suggests that they would be able to state a claim under section 1983 or 1985 if given leave to amend. As such, Plaintiffs will not be given leave to file a third complaint because amendment would be futile.

### D. *Subject Matter Jurisdiction*

A district court may decline to extend supplemental jurisdiction over a state law claim where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Whether supplemental jurisdiction will be extended under these circumstances is discretionary. Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009). Ordinarily, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988); see also Hedges v. Musco, 204 F. 3d 109, 123 (3d. Cir. 2000) ("where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so") (emphasis in original) (citation omitted)). If a district court decides not to exercise supplemental jurisdiction, it should dismiss the state law claims without prejudice. Kach, 589 F.3d at 650.

For the reasons explained above, Plaintiffs' federal claims will be dismissed. The only claims to survive this ruling are state law claims for negligence and intentional infliction of emotional distress. As the Amended Complaint predicates subject matter jurisdiction on the presence of a federal question, I must determine whether to exercise supplemental jurisdiction over the state law claims.

The interests of judicial economy, convenience, fairness and comity will not be served by extending supplemental jurisdiction over the remaining state law claims for negligence and intentional infliction of emotional distress. Therefore, I will decline to exercise supplemental

jurisdiction and will not rule on Defendants' motion to strike Plaintiffs' request for punitive damages or Defendants' motion to dismiss Plaintiffs' state law claims for failure to state a claim. The state law claims will be dismissed without prejudice, so they may be refiled in state court.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss will be granted. An appropriate Order follows.